**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>v.<br><br>Deshun Kashad Patterson,<br><br>                    Defendant. | Case No. 14-cr-339 (MJD/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Benjamin Bejar, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

Caroline Durham, 413 Wacouta Street, Suite 430, St. Paul, MN 55101, for Deshun Kashad Patterson

HILDY BOWBEER, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motion hearing on January 9, 2015. This case was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Trial is scheduled to commence before the Honorable Michael J. Davis, Chief Judge of the United States District Court for the District of Minnesota, on Monday, March 9, 2015.

The Court will address Defendant Deshun Kashad Patterson's Motion to Suppress Seizures as the Result of an Unlawful Search [Doc. No. 19] in this Report and Recommendation. The parties' nondispositive motions will be addressed in a separate Order.

I.      **Procedural Background**

Patterson is charged with one count of Felon in Possession of a Firearm – Armed Career Criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). (Indictment [Doc. No. 1]). Patterson filed a Motion to Suppress Seizures as the Result of an Unlawful Search on November 20, 2014, arguing he was unlawfully stopped, searched, and arrested on October 7, 2014, while riding his motorcycle in Minneapolis, Minnesota. (Def.'s Mot. Suppress [Doc. No. 19].) Patterson also challenged a search warrant authorizing a DNA buccal swab, as lacking probable cause and as the fruit of an illegal search. (*Id.*)

At the pretrial motions hearing on January 9, 2015, the Government called Minneapolis Police Officer Kenneth Tidgwell as a witness and introduced the following exhibits into evidence:

1. Government Exhibit 1: a DVD containing video footage and an audio recording of the October 7, 2014, traffic stop;

2. Government Exhibit 2: a photograph of a "Wheels of Soul, Sgt. of Arms" patch on the front of Patterson's leather jacket;

3. Government Exhibit 3: a photograph of "Wheels of Soul" patches on the back of Patterson's leather jacket; and

4. Government Exhibit 4: an application for search warrant; search warrant; and receipt, inventory, and return for a DNA sample via buccal swab from Patterson.

Patterson called private investigator Susan Johnson to testify and introduced Defendant's Exhibit 1: a "Wheels of Soul" DVD.[1]

---

[1] The Government objected to Defendant's witness's testimony and Defendant's Exhibit 1 on the basis that neither was disclosed prior to the hearing pursuant to D. Minn. LR

At the conclusion of the motion hearing, the parties requested and received permission to file post-hearing memoranda on the issues raised by Patterson's motion to suppress. The Court set the deadline for Patterson's post-hearing memorandum as Friday, January 16, 2015, and the deadline for the Government to respond as Friday, January 23, 2015. The Court took the motion to suppress under advisement on January 23, 2015, after briefing was complete.

## II.  Factual Background[2]

### A.  The Traffic Stop

Officer Kenneth Tidgwell has worked as a Minneapolis police officer since January 2008. Assigned to the Directed Patrol Unit (DPU), he primarily patrols the city's north side, investigates street-level narcotics violations and gang activity, and conducts undercover and street-level operations. Before Officer Tidgwell was employed as a police officer, he was employed as a corrections officer by the Minnesota Department of Corrections (DOC) for fifteen years. Most recently at the DOC, he held the title of Gang Coordinator and tracked gang activity in the Oak Park Heights and Rush City facilities.

As a police officer and corrections officer, Officer Tidgwell has accumulated years of training and experience involving outlaw motorcycle gangs. He has completed more than 2,000 hours of continuing education, attended annual seminars, and testified as an expert witness on matters related to outlaw motorcycle clubs and gangs. Officer

---

12.1. The Court invited the parties to address the merits of the objection in their post-hearing memoranda. Neither party briefed the issue, and the Court considers the objection abandoned and the testimony and exhibit admitted.

[2] The facts recounted in this section are taken from the testimony elicited and exhibits admitted at the motion hearing. No transcript of the hearing is available at this time.

Tidgwell knows that the most dangerous and criminally active outlaw motorcycle clubs are known as the "one-percent club." The one-percent club derives its name from the members' creed that they are the one-percent of society who need not obey the law. According to Officer Tidgwell, members of the one-percent club wear certain insignia, colors, and patches on their clothing for the purpose of intimidating members of other motorcycle clubs and law enforcement officers. He also knows that club members carry weapons for protection from other motorcycle clubs and law enforcement officers.

Officer Tidgwell knows from his training and experience that the Wheels of Soul motorcycle club is a member of the one-percent club. He is very familiar with the Minnesota chapter of the Wheels of Soul, and in 2012, he participated in the investigation and prosecution of several Wheels of Soul members in Missouri. He knows the particular insignia and colors associated with the group and their reputation for committing crimes and acts of violence.

At approximately 6:00 p.m. on October 7, 2014, Officer Tidgwell was patrolling the north side with two other officers in an unmarked squad car. He was driving east on West Broadway Avenue in heavy traffic, when he saw the motorcycle driving directly in front of him turn left on Emerson Avenue. He observed that the motorcycle failed to yield to several pedestrians in the crosswalk, who were crossing in compliance with a walk signal. Officer Tidgwell knows that a driver's failure to yield to a pedestrian in a crosswalk is a traffic violation. The motorcycle driver was wearing a jacket with a Wheels of Soul emblem on the back. (*See* Gov't Ex. 3.) As Officer Tidgwell started to turn left and follow the motorcycle, one of the pedestrians in the crosswalk pointed

4

downward, as if to signal that he had the right-of-way. Officer Tidgwell waited for the pedestrians to exit the crosswalk before turning left and following the motorcycle. One of the officers with Officer Tidgwell entered the motorcycle's license plate number into the squad car computer and learned that the registered owner was Deshun Patterson.

Officer Tidgwell has known Patterson for approximately twenty-five years, and he recognized the name. Officer Tidgwell also knew that Patterson lived on the north side. Officer Tidgwell first encountered Patterson when he was a corrections officer at Oak Park Heights and Patterson was incarcerated there. He knew that Patterson was affiliated with a gang, and that he had been convicted of first-degree attempted murder, two assaults, and several drug offenses. On multiple occasions, Officer Tidgwell had heard Patterson's name affiliated with violent, criminal activity, and he knew Patterson was the subject of an officer safety advisory issued by the Minneapolis Police Department.[3] He also knew that Patterson was a member of the Wheels of Soul motorcycle gang. Officer

---

[3] Patterson objected to Officer Tidgwell's testimony on the basis that the Government did not disclose the intelligence reports and safety advisory that contributed to his background knowledge of Patterson. The Court invited the parties to brief the issue, and they did so in their post-hearing memoranda. Patterson argued the materials should have been provided as discovery before the motion hearing, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(C), (D), and (E). But Rule 16(a)(1)(C) applies only to an organizational defendant, which Patterson is not. Rule 16(a)(1)(D) pertains to a defendant's "prior criminal record," which the Government represents, and Patterson does not dispute, it provided. Rule 16(a)(1)(E) concerns documents and objects that (i) are "material to preparing the defense"; (ii) the government intends to use at trial; or (iii) were obtained from or owned by the defendant. Only subsection (i) is potentially applicable here, but Defendant has not explained how the *inculpatory* reports and advisory would be material to his defense. Moreover, Patterson has cited no authority requiring the disclosure of materials reviewed in forming an officer's general, background knowledge of an individual. Finally, even if the documents were material, the Court need not rely on Officer Tidgwell's challenged testimony to reach its findings and conclusions on the motion to suppress.

5

Tidgwell learned from confidential informants that Patterson and other Wheels of Soul members previously had assaulted members of other motorcycle clubs, and that Patterson almost always carried a weapon. Officer Tidgwell recalled a report of Patterson pistol-whipping an individual in a bar.

Officer Tidgwell most recently had encountered Patterson a few weeks before October 7, 2014, when he also stopped Patterson on his motorcycle. Officer Tidgwell issued a citation to Patterson and released him. There was no evidence at the hearing about whether Patterson was frisked or searched during that encounter.

After Officer Tidgwell learned that Patterson was the registered owner of the motorcycle, he activated the squad car lights, video camera, and audio recording system. (*See* Gov't Ex. 1.) The motorcycle pulled over and stopped. Officer Tidgwell approached the motorcycle on the right side—the non-kickstand side—for his own safety and to keep Patterson off-balance. Officer Tidgwell visually identified the driver as Patterson and called him by name. To ensure the safety of the officers, Officer Tidgwell asked Patterson to turn off the engine and hold the motorcycle upright with his legs. Patterson complied. Officer Tidgwell also asked Patterson if he had "anything on you I need to know about," to which Patterson replied no. Patterson asked why he had been stopped. Tidgwell initially replied that it would be in his police report, but then said that Patterson had failed to yield to pedestrians in the crosswalk.

Officer Tidgwell noticed a round patch embroidered with "Wheels of Soul, Sgt. of Arms" on the front of Patterson's jacket. (*See* Gov't Ex. 2.) Officer Tidgwell knows, based on his training and experience, that the Sergeant of Arms for an outlaw motorcycle

club is the custodian of weapons and the chief enforcer, disciplinarian, and defender. From his personal knowledge of Patterson and the Wheels of Soul motorcycle club, and his observation of the patch, Officer Tidgwell believed Patterson was carrying a firearm. Therefore, Officer Tidgwell decided to pat-search Patterson for weapons. He told Patterson to remove his full-face helmet, and asked Patterson if he had a weapon. Officer Tidgwell did not testify to Patterson's response, and the Court cannot discern Patterson's response from the squad car video or audio recording, but the audio recording clearly establishes that Officer Tidgwell said "yes" after Patterson's response, with an inflection that indicates he was echoing an affirmative answer from Patterson. Moreover, Officer Tidgwell's actions immediately after Patterson's response are consistent with an affirmative answer by Patterson. Based on the Court's viewing of Government Exhibit 1, the Court finds that Patterson affirmatively indicated to Officer Tidgwell that he had a weapon.

   Officer Tidgwell told Patterson to place his hands behind his back, and the three officers handcuffed him. According to Officer Tidgwell's testimony, these actions were taken for the safety of the officers and other people nearby. The squad car video reveals that Officer Tidgwell next asked Patterson where the gun was. Patterson did not respond. Based on his training and experience, Officer Tidgwell knows that guns are frequently kept in easily accessible locations, such as the front of one's body. Officer Tidgwell therefore began feeling the right, front side of Patterson's jacket and felt a hard object. He asked Patterson if the object was a gun, and Patterson said it was a cell phone. Patterson glanced down to his left, which Officer Tidgwell took as a nonverbal cue that

7

the gun was there. He moved his hand to the left, front side of the jacket and felt a hard object inside. Officer Tidgwell then opened Patterson's jacket and removed a purple Crown Royal bag, through which he could feel the butt of a firearm.

### B. The Search Warrant

On October 8, 2014, Minneapolis Police Officer Danielle Evans applied for a search warrant for a DNA sample via buccal swab from Patterson, who was in custody at the Hennepin County Jail. (Gov't Ex. 4 at 1.) According to Officer Evans' supporting affidavit, Patterson had been arrested the day before for possessing a firearm. Officer Evans summarized the traffic stop consistent with Part II.A. *supra*. The DNA sample was requested for comparison with a sample to be obtained from the firearm seized from Patterson. The search warrant was signed and executed on October 8, 2014.

## III. Discussion

### A. The Traffic Stop

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend IV. A police officer may briefly detain and question a person suspected of committing criminal activity, including the driver of a vehicle, without violating the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *United States v. Hensley*, 469 U.S. 221, 226 (1985).

Patterson argues that Officer Tidgwell acted on an inarticulable suspicion or hunch when he stopped the motorcycle, rather than specific facts supporting a reasonable, articulable suspicion of criminal activity. It is well-established, however, "that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'"

*United States v. Barry*, 98 F.3d 373, 376 (8th Cir. 1996) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)). Under Minnesota law, "vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or adjacent crosswalk." Minn. Stat. § 169.06, subd. 5(a)(1)(i). Here, Officer Tidgwell saw Patterson commit a traffic violation when he failed to yield to the pedestrians lawfully in the crosswalk. Thus, Officer Tidgwell had probable cause to stop the motorcycle.

Patterson suggests that the commission of such a minor traffic offense did not justify the stop. This position is flatly contrary to established law. *See, e.g.*, *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) (finding probable cause for traffic stop when officer observed car following another car too closely and improperly changing lanes); *Barry*, 98 F.3d at 376 (finding probable cause for traffic stop when officer observed car driving erratically and crossing the marked line). Committing even a petty misdemeanor such as riding a bicycle at night without a headlight establishes, at minimum, a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop. *United States v. Banks*, 553 F.3d 1101, 1104 (8th Cir. 2009).

Patterson also suggests that Officer Tidgwell intended to stop and search him for a weapon regardless of whether he committed a traffic offense, and thus the traffic violation was a mere pretext for the stop. Probable cause exists, however, "even if a valid traffic stop is a pretext for other investigation." *Linkous*, 285 F.3d at 719; *see Whren v. United States*, 517 U.S. 806, 812-13 (1996) (citing decades of precedent that "foreclose any argument that the constitutional reasonableness of traffic stops depends on

the actual motivations of the individual officers involved").

Having found that Officer Tidgwell had probable cause to stop Patterson for committing a traffic violation, the Court now turns to the scope of the stop. An officer conducting a *Terry* stop "does not violate the Fourth Amendment by asking the driver his destination and purpose, checking the license and registration, or requesting the driver to step over to the patrol car." *Linkous*, 285 F.3d at 719. Officers may also take any action "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235. "If the officer develops a reasonable, articulable suspicion of criminal activity beyond the reason for the traffic stop, the officer may expand the scope of the inquiry and detain the occupants . . . for further investigation." *United States v. Poulack*, 236 F.3d 932, 936 (8th Cir. 2001).

"The standard for reasonable suspicion is less demanding than that for probable cause; it requires only 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" *United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993) (quoting *United States v. Martin*, 706 F.2d 263, 265 (8th Cir. 1983)). Police may consider facts "based on their own observations, police reports, and patterns of particular types of lawbreakers." *Id.*; *see Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A] police officer views the facts through the lens of his police experience and expertise."). Facts that would be considered innocent if viewed individually, "when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011). A reviewing

court must "consider the totality of the circumstances in light of the officers' experience and specialized training." *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012); *see Ornelas*, 517 U.S. at 696 (giving deference to inferences drawn by the police based on background facts, historical facts, and the officers' own experience and expertise).

To expand the scope of a traffic stop to include a pat-down for weapons, a police officer must have "reason to believe the detained individual may be armed and dangerous." *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006). The Court applies an objective test to determine "whether the police officer had reasonable, articulable suspicion for the pat-down." *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010). The officer need not "be certain that the suspect was armed. Rather, a pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* (quoting *Terry*, 392 U.S. at 27).

After Officer Tidgwell approached the motorcycle, he asked Patterson to turn off the engine and hold the motorcycle upright. Patterson does not challenge these particular actions as beyond the scope of a *Terry* stop, and the Court finds they were proper under *Terry*. Officer Tidgwell next asked Patterson if he had "anything" on him that Officer Tidgwell should know about. Patterson said no and asked why he had been stopped. Tidgwell initially answered that the reason would be in his police report, but then explained to Patterson that he had failed to yield to pedestrians in the crosswalk. Patterson does not challenge this particular exchange as beyond the scope of the *Terry* stop, and the Court concludes it was proper.

By this time, Officer Tidgwell had noticed a "Wheels of Soul, Sgt. of Arms" patch on the front of Patterson's jacket. Officer Tidgwell knew from his training, education, and experience that a person with the rank of Sergeant of Arms in an outlaw motorcycle club, such as the Wheels of Soul, is the custodian of weapons and the chief enforcer, disciplinarian, and defender of the club. Officer Tidgwell knew that the Wheels of Soul motorcycle club was involved in criminal and violent activities and that Patterson was a member of the club. Officer Tidgwell also knew that Patterson was a convicted felon with convictions for attempted murder and assault, was believed to almost always carry a firearm, and had been involved in a pistol-whipping incident at a local bar.

The Court finds that the totality of the circumstances—Officer Tidgwell's observation of the Sergeant of Arms patch, his personal knowledge of Patterson, and his education and expertise with the Wheels of Soul motorcycle club and other outlaw motorcycle gangs—gave rise to a reasonable, articulable suspicion that Patterson was armed and dangerous. *See United States v. Flett*, 806 F.2d 823, 828 (8th Cir. 1986) (finding reasonable suspicion to perform pat-search in part because suspect "was a known member of a national motorcycle gang which had violent propensities, including charges of using firearms, assault and resisting arrest, . . . was known as the 'enforcer' of the local chapter, . . . [and] had a previous charge filed against him involving the use of a firearm"). In addition, as evident from the audio and video recording, Patterson indicated affirmatively in response to Officer Tidgwell's question that he had a weapon. Patterson's response reinforced Officer Tidgwell's already-existing reasonable, articulable suspicion that Patterson was armed and dangerous.

Patterson submits that because no weapon was seized during the stop that preceded the October 7, 2014, stop, there was no reason to believe that he possessed a weapon on October 7th. There was no evidence or testimony at the motion hearing, however, that Patterson was searched during the earlier encounter, only that he was stopped by Officer Tidgwell and given a citation. But even assuming Patterson was searched and no weapon was recovered, that fact would be only one of many in the totality of the circumstances analysis, and does not negate Officer Tidgwell's reasonable, articulable suspicion that Patterson was armed and dangerous on October 7, 2014.

Once Officer Tidgwell decided to pat-search Patterson for weapons, but before he actually performed the pat-search, he told Patterson to remove his helmet and asked Patterson if he had a weapon. Patterson does not challenge these particular actions as beyond the scope of a *Terry* stop, and the Court finds they were proper under *Terry*.

At this point during the stop, the three officers on the scene placed Patterson in handcuffs. Patterson argues he should not have been handcuffed, because he had complied fully with Officer Tidgwell's commands throughout the encounter. But a suspect's cooperation with police during an encounter does "not negate the risk that [the suspect] was armed and potentially dangerous." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). An officer may handcuff a suspect during a *Terry* stop when the circumstances create a credible concern that the suspect is armed and the officer's safety is threatened. *See United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992). The circumstances in this case gave rise to a credible concern that Patterson was armed. The decision to handcuff Patterson was reasonable and did not transform the *Terry* stop into

13

an unlawful detention.

During the next phase of the stop, Officer Tidgwell felt a hard object in the right, front side of Patterson's jacket, which Patterson said was a cell phone. He next felt a hard object in the left, front side of Patterson's jacket, and seized a Crown Royal bag containing a handgun. These actions did not exceed the scope of *Terry* or what was reasonable under the circumstances.

### B. The Search Warrant

Patterson did not address the search warrant in his post-hearing memorandum. Nonetheless, the Court has reviewed the warrant and supporting affidavit, and finds the supporting affidavit provided probable cause for the warrant. Furthermore, given the findings and conclusions in Part III.A *supra*, the Court finds that the search warrant was not a fruit of an unlawful search or seizure.

### IV. Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Deshun Kashad Patterson's Motion to Suppress Seizures as the Result of an Unlawful Search [Doc. No. 19] be **DENIED**.

Dated: January 30, 2015

    s/ *Hildy Bowbeer*
    HILDY BOWBEER
    United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 13, 2015** with a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within fourteen days after service thereof. A district judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Eighth Circuit Court of Appeals.